# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| v. | § CRIMINAL NO. 4:17-CR-000514 |
| | § |
| PAULO JORGE DA COSTA | § |
| CASQUEIRO MURTA | § |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
## PAULO MURTA'S BRIEF IN SUPPORT OF BAIL

The United States ("the government"), by and through its undersigned attorneys, hereby responds in opposition to Paulo Jorge Da Costa Casqueiro Murta's ("Defendant" or "Murta") brief in support of bail. DE 213. Defendant poses a significant flight risk. Defendant is a citizen of a non-extraditing country, has significant assets abroad, and has no ties to the United States. He is charged with participating in an international money laundering conspiracy for his role in structuring transactions to conceal bribe payments and criminal proceeds. The government's proof against Defendant is strong, and he faces a substantial custodial sentence if convicted; the estimated applicable sentencing guidelines range is 292-365 months' imprisonment. Moreover, Defendant has failed to identify cases as requested by the Court in which a similarly-situated defendant was released on bond. Accordingly, for the reasons set forth below, as well as those stated at hearings before the Court on July 22, 2021 and July 26, 2021, the government respectfully submits that Defendant should be detained pursuant to 18 U.S.C. § 3142(e)(1).

## PROCEDURAL BACKGROUND

On April 24, 2019, Defendant was charged in connection with the government's long-running investigation into bribery and corruption at Petróleos de Venezuela, S.A. ("PDVSA"), the Venezuelan

state-owned and -controlled oil company. At present, the government has announced charges against 28 individuals in connection with the investigation, 22 of whom have pleaded guilty.

### A. The Government's Investigation

This case involves a corrupt scheme in which Venezuelan officials and U.S.-based suppliers of equipment and services exploited an energy and financial crisis in Venezuela to unlawfully enrich themselves. These U.S.-based suppliers paid bribes to Venezuelan government officials in exchange for the PDVSA officials' assistance in ensuring that the U.S.-based suppliers were paid on outstanding invoices and continued to obtain new contracts with PDVSA. Those bribes were then laundered through various international bank accounts to conceal the nature, source, and ownership of the bribe proceeds.

On December 10, 2015, Roberto Rincon Fernandez ("Rincon") and Abraham Shiera Bastidas ("Shiera") were indicted under seal on 18 counts of conspiracy to violate the FCPA and to commit wire fraud, substantive violations of the FCPA, conspiracy to commit money laundering, and substantive money laundering. *See United States v. Roberto Enrique Rincon Fernandez and Abraham Jose Shiera Bastidas*, No. 4:15-cr-00654. The indictment alleged that Rincon and Shiera were paying bribes to PDVSA officials in charge of procurement in order to obtain improper business advantages— namely, additional contracts with PDVSA and the ability to get paid on outstanding invoices ahead of other PDVSA vendors. Shiera pleaded guilty in March 2016, and Rincon pleaded guilty in June 2016.

In August 2017, a grand jury sitting in the Southern District of Texas returned a 20-count indictment charging five former Venezuelan government officials with various money laundering and FCPA offenses. *See United States v. Luis Carlos De Leon Perez, et al.*, No. 4:17-cr-00514. The indictment alleged that, in or about 2011, a group of then-current and former high-level officials of PDVSA and PDVSA subsidiaries (referred to in the indictment as the "management team") solicited several PDVSA vendors, including Rincon and Shiera, for bribes and kickbacks in exchange for providing

assistance to those vendors in connection with their PDVSA business. The indictment further alleged that the co-conspirators laundered the proceeds of the bribery scheme through a series of complex international financial transactions. The "management team" included Luis Carlos De Leon Perez ("De Leon"), the former finance director for Electricidad de Caracas, a majority-owned subsidiary of PDVSA; Nervis Gerardo Villalobos Cardenas ("Villalobos"), the former Vice Minister of Energy for Venezuela; Cesar David Rincon Godoy ("Cesar Rincon"), the former General Manager of Bariven, PDVSA's procurement subsidiary; Alejandro Isturiz Chiesa ("Isturiz"), the former Assistant to the President of Bariven; and Rafael Ernesto Reiter Munoz ("Reiter"), the former Head of Security and Loss Prevention for PDVSA. In total, the indictment alleged that accounts controlled by Rincon and Shiera transferred over $27 million to a Swiss bank account, from which $27 million was then transferred to other accounts used in connection with the scheme.

In September 2019, a superseding indictment (the "Superseding Indictment") that charged three additional individuals—Javier Alvarado Ochoa ("Alvarado"), the former President of Bariven; Daisy Teresa Rafoi Bleuler ("Rafoi"), a Swiss banker, and Defendant, was unsealed. The charges against Defendant arose from his role in a bribery and money laundering scheme whereby he and Rafoi assisted Rincon, Shiera, and the other members of the "management team" in laundering and concealing the proceeds of their bribery scheme through the international financial system, including through banks in the United States and in Switzerland. The superseding indictment alleges that Rincon and Shiera transferred $25.9 million into accounts created by the Defendant, which was then further transferred to members of the "management team."

To date, Isturiz remains at large; Villalobos and Reiter are in extradition proceedings inm Spain; Alvarado has avoided extradition by obtaining Spanish citizenship; De Leon and Cesar Rincon have waived extradition, appeared voluntarily here in the Southern District of Texas, and pleaded

guilty; and Rafoi, who was arrested in Italy in July 2019 and then released, fled to Switzerland and is currently a fugitive.

## B. Proceedings Against Defendant

### i. Proceedings in Portugal and Extradition Proceedings

The Portuguese authorities were conducting a separate investigation of Defendant in connection with the bankruptcy of the Espirito Santo Group in Portugal, in what Defendant's Portuguese lawyer described as "maybe the biggest investigation ever, criminal investigation in Portugal." (7/26 Tr. p. 69.) In connection with that investigation, Defendant was subject to certain restrictive measures by the Portuguese authorities beginning in 2017, which changed over time. Defendant was, at times, prohibited from leaving Portugal without court approval. (7/26 Tr. 66-67.) He was further required to place €750,000 (approximately $875,000) in a Portuguese court's registry as a bond. (*Id.*) If Defendant were to leave Portugal and not return, he would risk losing that bond. (7/26 Tr. 82-83.) Since July 2018, three of Defendant's Portuguese properties have been frozen by a Portuguese court, preventing him from selling them. (*Id.* at 77.) They are worth approximately $3.5 million. (7/22 Tr. 10.)

The Superseding Indictment returned in the Southern District of Texas charged Defendant with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), one count of conspiracy to violate the FCPA, in violation of 18 U.S.C. § 371, and two counts of international promotional money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). On April 29, 2019, an arrest warrant was issued for Defendant out of the Southern District of Texas. In May 2019, Defendant was arrested in Portugal and the government formally initiated extradition proceedings of Defendant from Portugal. (7/26 Tr. at 72.) After a brief detention following his arrest, he was released but Portuguese authorities imposed additional restraints on Defendant, prohibiting him from leaving Portugal and requiring him to appear in a police station every day. (*Id.*) Later, the conditions were

4

modified to require Murta to present himself in a Portuguese police station once per week. Defendant appealed his extradition to multiple courts in Portugal and at least one court in the European Union. On June 2, 2021, after Defendant exhausted his appeals, he was again arrested by Portuguese authorities and detained pending his extradition.

### ii. Proceedings in the Southern District of Texas

On July 9, 2021, Defendant was flown from Portugal to the Southern District of Texas, where he had his initial appearance in this matter on July 12, 2021. The government moved for detention and Defendant requested additional time to prepare for the detention hearing. On July 22 and July 26, 2021, the Court held a detention hearing. At the conclusion of the hearing, the Court shared its preliminary view that the government had shown by clear and convincing evidence that no condition or combination of conditions could reasonably assure the Defendant's appearance (*id.* at 115-116), but the Court requested that Defendant identify, in a brief, the specific conditions of release he was requesting and to identify a case with similar facts to this one: "what I'm really looking for is [] any other case where under something similar where there's no legal status in the United States, the person's from a country that doesn't have extradition, where they have significant assets, and they have family in the place that's no extradition." (*Id.* at 117.)

## ARGUMENT

### A. Legal Standard

Under the Bail Reform Act, "a defendant shall be released pending trial unless a judicial officer determines that release will not reasonably assure the appearance of the person as required." *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989). The risk of flight determination is governed by the simple preponderance standard. In assessing flight risk, a judicial officer need only "determine, from the information before him, that it is more likely than not that no condition or combination of conditions will reasonably assure the accused's appearance." *United States v. Fortna*, 769 F.2d 243 (5th

5

Cir. 1985) (distinguishing this standard governing the flight risk determination with the higher clear and convincing burden of proof that governs detention based on danger to the community).

In assessing risk of flight, courts consider a variety of factors, including the nature and circumstances of the charged offense, and the defendant's history and characteristics, such as ties to the community, past criminal history, and financial resources. *Fortna*, 769 F.2d at 252 (citing 18 U.S.C., sec. 3142(g)); *see United States v. Trosper*, 809 F.2d 1107, 1110-11 (5th Cir. 1987) (affirming pretrial detention order because of risk of flight based on defendant's family ties, the possible involvement of his daughter in the arrest, his financial condition, and false identification material).[1]

### B. Defendant is a Flight Risk and Should be Detained

As this Court observed on July 26, Defendant is a flight risk; no combination of conditions of release can assure his appearance.[2] *See* 18 U.S.C. § 3142 *et seq.* Defendant has no ties to the Southern District of Texas and no ties to the United States outside of his criminal activity.[3] He is a Swiss citizen, and Switzerland does not extradite its citizens to the United States.[4] His family lives abroad: his wife

---

[1] In his motion, the Defendant cites to the standard in the Second Circuit for determining how a court should assess whether to detain a defendant based on a risk of flight. DE 213. at 7-8. That simply is not the standard in this Circuit.

[2] The government is not arguing that Defendant's immigration status compels detention, although it is entirely appropriate for the Court to consider a defendant's personal history and characteristics, as well as ties to the United States. Defendant was brought to the country based on a grant of "parole" pursuant to the Immigration and Nationality Act. The government is not aware of any immigration detainer that has been filed against the Defendant. Thus, the cases cited by Defendant regarding defendants subject to a detainer are inapposite. *See* DE 213 at 8-11.

[3] Defendant's wife rented an apartment for 30 days via Airbnb in the Houston area. *See* DE 213, Ex. 6. This cannot amount to a cognizable tie to the Southern District of Texas for the purposes of the Bail Reform Act.

[4] The government's concerns about Defendant fleeing to Switzerland and being unavailable to U.S. prosecution are not hypothetical. Another defendant in this case, Daisy Rafoi, absconded from Italy and returned to Switzerland after she was arrested in Lake Como on an international arrest warrant. Rafoi is now effectively outside the reach of U.S. law enforcement. (7/22 Tr. at 23). As the Court

6

is a Swiss citizen who resided with Defendant in Portugal; his children and sisters live in Portugal; and his wife's children reside in Switzerland. He previously rented an apartment in Dubai, another location from which he is unlikely to be extradited to the United States. Defendant is charged with conspiring to execute an international money laundering and bribery scheme, using accounts in Switzerland and Dubai; it is very likely that he has international assets that the government has been unable to identify, trace, or freeze.

The nature and circumstances of the offenses Defendant is charged with in the superseding indictment weigh in favor of detention. The case against Defendant and potential resulting punishment provide ample incentive to flee. The government's case is well-supported by strong evidence, as this Court acknowledged (7/26 Tr. at 115), including Defendant's own inculpatory communications.[5] There are multiple cooperating witnesses who will provide direct testimony regarding Defendant's involvement in the charged criminal scheme and corroborating documentary evidence. Furthermore, he faces a significant sentence under the United States Sentencing Guidelines. Were he convicted at trial, Defendant would effectively face a life sentence—he would have a total offense level of 40, which results in a sentencing range of 292-365 months' imprisonment. (7/26 Tr. 120.) Indeed, the severity of the Defendant's potential sentence weighs heavily in favor of detention. *See United States v. Joshi*, No. 4:16-cr-385, 2017 WL 2334878, at *3 (S.D. Tex. Jan. 4, 2017) (explaining that with respect to the factors that a court must consider in determining whether pretrial release on

---

noted, "if he was released and both he and his wife fled, then the case would be over, just like it was for another co-defendant." (7/26 Tr. at 115.)

[5] Special Agent Munoz described one of the communications (Government Exhibit 1 and 1-A at the detention hearing): "Mr. Murta had emailed Mr. Shiera a hand drawn diagram which was depicting what was actually discussed there at the meetings, showing the flow of money, how he would see the concept of how the laundering scheme would work, money would come in and money would go out, and it just depicted that." (7/22 Tr. 28.)

7

the basis of risk of flight is appropriate, the severity of the penalty is part of the nature and circumstances of the offense).

Moreover, Defendant's coconspirators and codefendants have been detained in this district despite stronger bases for release than Defendant's. Prior to his arrest, Rincon lived in Houston for approximately ten years and owned a residence worth approximately $5 million. Nevertheless, United States Magistrate Judge Nancy K. Johnson ordered Rincon detained pending trial. *U.S. v. Rincon*, 15-cr-654-NKJ, DE 16 (S.D. Tex. Dec. 19, 2015) at 3.[6] In making its ruling, the Court noted, *inter alia*, that: (1) Rincon was a Venezuelan national, who, although previously a legal permanent resident of the United States, had only spent 41 days of the preceding four months in the United States; (2) Rincon had residences in Spain and Aruba; (3) Rincon's wife was a Venezuelan citizen, as were his three children, although the children were legal permanent residents of the United States; (4) Rincon had extensive liquid assets abroad; (5) the conspiracy involved numerous foreign bank accounts, including some in Switzerland, which could not be fully traced due to Swiss banking secrecy laws; (6) Venezuela has no extradition treaty with the United States; and (7) a close friend of Rincon's who was wanted in the United States was arrested in Aruba on Rincon's private plane. *Id.* at 3-4. Nearly all of the factors that supported Rincon's detention are present here, and Rincon was detained despite the fact that he had far deeper ties to the United States and the Southern District of Texas.

De Leon,[7] who is a dual United States and Venezuelan citizen, and who maintained a residence in Florida, was arrested in Spain and agreed to be extradited to the United States. He was ordered detained in this case by United States Magistrate Judge Frances H. Stacy. *United States v. De Leon*, 17-

---

[6] Shiera was detained pending a hearing, which he ultimately waived. *See U.S. v. Rincon*, 15-cr-654, DE 31 (S.D. Tex. Feb. 8, 2016).

[7] Cesar Rincon, who also agreed to be extradited to the United States from Spain, was also detained pending a hearing, which he ultimately waived. *See U.S. v. De Leon, et al.*, 17-cr-514, DE 52 (S.D. Tex. Apr. 10, 2018).

8

cr-514, DE 55 (S.D. Tex. April 11, 2018). Among other things, the court noted that De Leon: (1) had residences in Florida, Venezuela, and Spain; (2) had apartments in Venezuela, which is a country that does not extradite its citizens to the United States; (3) had access to millions of dollars which could support a fugitive lifestyle; (4) had no ties to the community; and (5) traveled internationally by private jet 26 times in the preceding five years. While the government does not allege that Defendant makes extensive use of private jets, each of the other factors cited by the court applies to Defendant.

Defendants who are similarly situated to Defendant are routinely detained pending trial in this district. *See, e.g.*, *United States v. Stanford*, 341 Fed. Appx. 979, 983 (5th Cir. 2009) (affirming detention where, *inter alia*, defendant had minimal recent ties to Houston, significant ties outside of the country, unaccounted for assets, an international network, and private jets); *United States v. Almasri*, No. H-07-155, 2007 WL 2964780, at *2 (S.D. Tex. Oct. 10, 2007) ("This court finds that the combination of the defendant's strong family and financial ties to countries outside the United States; the lack of property in Houston; the access to financial resources to facilitate flight; and the severe sentence that defendant may face if convicted, support the finding that no combination of conditions can be imposed that will reasonably assure the defendant's appearance at trial."); *United States v. Plato*, No. H-11-263, 2011 WL 13069401, at *2 (S.D. Tex May 17, 2011) (detaining defendant where he faced up to 20 years in prison, had a valid passport, traveled internationally, and "at least some access to assistance through various bank accounts and from family members"); *United States v. Joshi*, No. 4:16-cr-385, 2017 WL 2334878 (S.D. Tex. Jan. 4, 2017) ("Taken together, the severity of the punishment the Defendants may be subjected to if convicted of the charges alleged in the indictment, the evidence of the Defendants' involvement in a complex international network including ties to India, the evidence of the Defendants' creation and use of multiple forms of false identification, and the complete lack of ties to Houston, Texas compel the Court's determination that the Defendants pose a significant risk of fleeing the Court's jurisdiction prior to trial.").

9

## C. Defendant's Legal Authority is Distinguishable and Unpersuasive

Defendant fails to cite to a single case that answers the question posed to him by this Court at the conclusion of the July 26, 2021 hearing. Instead, Defendant cites six out-of-Circuit cases that are inapposite and distinguishable. DE 213 at 12-15. Defendant also fails to mention Defendant's similarly-situated co-defendants who were detained despite having far more extensive ties to the District, waiving extradition, and voluntarily appearing in the United States. DE 213 at 12-15.

For example, in *United States v. Khashoggi*, 717 F. Supp. 1048 (S.D.N.Y. 1989), which Defendant cites to, the defendant had significant ties to the United States. He owned an apartment in New York in a building in which one of his brothers also owned a residence. Two of his six children lived in the United States and one of his siblings lived in Maryland. 717 F. Supp. at 1050. Unlike Defendant, the defendant waived his appellate rights after a Swiss court granted extradition, which the court found to be persuasive evidence that the defendant would remain in the district and face the charges against him. *Id.* at 1052. Additionally, while the defendant was a Saudi national and no extradition treaty existed between Saudi Arabia and the United States, the Royal Consulate General of Saudi Arabia had guaranteed the court that Saudi Arabia would insure the defendant's appearance at trial. *Id.* Under those circumstances, the court granted release, but imposed a $10 million dollar bond. Defendant's situation could not be more different than that of the defendant in *Khashoggi*. He has no ties to the district or the United States, he appealed his extradition to every level of the Portuguese legal system and to a European Union court, and the government of Switzerland has not, and will not, guarantee his appearance in this court.

Similarly, *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. 2009) is inapposite. There, the defendant was a U.S. citizen with a residence in the Southern District of New York. The government did not initially seek detention, and only sought detention after it appeared that the defendant had violated financial conditions imposed in separate, civil litigation by dissipating approximately $1

million in assets to family members and close personal friends. At a hearing on the issue, the government conceded that the prior bail orders entered in the case "substantially diminished" the risk of flight. 586 F. Supp. 2d at 244-49. Because the court determined that the defendant was not a risk of flight, the court considered whether the defendant was a danger to the community, and determined he was not. Thus, the court held that the government had not met its burden for detention, but did impose additional conditions on defendant's release. *Id.* at 250-255. Ultimately, in addition to home confinement and a freeze on his assets, defendant's bond was secured by $10 million, his New York apartment, and his wife's properties in Montauk, New York, and Palm Beach, Florida. Moreover, his wife was subject to restraint on dissemination of her personal property as part of defendant's bond package. *Id.* at 244, 254-55.[8]

Neither *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), nor *United States v. Hanson*, 613 F. Supp. 2d 85 (D.D.C. 2009), two cases from District of Columbia involving defendants charged with violating the Export administration Act ("EEA") and the International Economic Emergency Powers Act ("IEEPA"), provide support for Defendant's position on release. The defendant in *Karni* was a South African national who also had dual citizenship in Israel with no ties to the district or to the United States. He was arrested in Colorado and released on bond. While the court ultimately denied the government's motion for revocation of release, it imposed additional conditions on the defendant. The court did not, however, address the defendant's financial wherewithal. The decision notes only a single residence in South Africa. 298 F. Supp. 2d at 132. The court also did not address

---

[8] *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009), also cited by Defendant, is also distinguishable. There, the defendant was a U.S. citizen and had an apartment in the Southern District of New York. Despite his considerable financial means, the court ruled that pretrial release was appropriate, and imposed several conditions, including a $10 million bond and armed security guards placed outside the defendant's apartment. The court required the defendant to "expressly consent in writing to the use, by armed security guards, of 'temporary preventative detention and use of reasonable force' to thwart any attempt to flee." Id. at 834. Moreover, *Kashoggi*, *Madoff*, and *Dreier* were cases in the Second Circuit, which as explained in Footnote 1, applies a different standard than the Fifth Circuit.

whether his extradition would be possible if the defendant fled to South Africa or Israel. Unlike Defendant, the defendant in *Karni* was arrested in the United States, and had not been engaged in extensive litigation contesting his extradition prior to his arrival in the United States. In *Hanson*, the district court applied the reasoning in *Karni*, which involved the same set of offenses, and granted the defendant's motion for release. 613 F. Supp. 2d at 90-91. There, the defendant was a naturalized United States citizen and married to a U.S. citizen with a residence in Maryland, where her adopted son also lived. Moreover, the defendant was facing a far less substantial sentence than Murta if convicted – the government calculated defendant's base offense level under the United States Sentencing Guidelines as a 26, resulting in a guideline sentencing range of 63-78 months if convicted at trial. 613 F. Supp. 2d at 87. Not only does Defendant face a much higher potential sentence, he has no ties to the district or the United States, making his situation entirely distinguishable from that in *Hanson*.

Finally, the Defendant cites to *United States v. Tomasz Holda*, No. 1:04-cr-368 (N.D. Ga. 2004).[9] There, the defendant was arrested during execution of a search warrant at his residence, which was apparently located in the district. *See* No. 1:04-cr-368, DE 71 at 1 (N.D. Ga. Mar. 3, 2005). After a bond hearing, the defendant was originally detained as a risk of flight. The Magistrate Judge cited to defendant's substantial financial resources and his ties to Belize and Poland. *See* No. 1:04-cr-368, DE 55 at 2 (N.D. Ga. Nov. 29, 2004). The defendant filed a motion for reconsideration, which the court ultimately granted, and the defendant was released. He was required to post a $250,000 bond, pledge his property in the district, and hire security guards at his own expense to monitor him. *Id.* at 2-3. Unlike the defendant in *Holda*, Murta has no ties to the district, was not arrested in the district, and has no property in the district to pledge to secure his bond.

---

[9] The defendant did not cite to specific portions of the record in making his argument, but the government has provided docket entries for the Court's reference.

In contrast to the cases cited by Defendant, Rincon and De Leon are defendants in this district who are similarly situated to Defendant, and the rationale supporting their detention applies with equal, if not greater, force here.

### D.     Defendant's Additional Arguments Fail

Defendant argues, *inter alia*, that because he did not flee from Portugal to Switzerland, he should not be deemed a flight risk from the United States. DE 213 at 3. Defendant, however, had extensive ties to Portugal, where he lived with his wife. Defendant owns three properties in Portugal, including his primary residence, an apartment, and a ranch. The Portuguese "froze" these properties, worth approximately $3.5 million. If Defendant had fled, he would have abandoned these significant assets, including his primary home, and he apparently cannot sell these properties during the pendency of Portuguese civil proceedings. In addition, Defendant was required to post a €750,000 (approximately $875,000) bond. In sum, if Defendant left Portugal, he would have abandoned the community he lived in, along with substantial assets and a significant bond. These are precisely the type of community ties and significant assets that he lacks in the United States.[10]

Defendant also argues that he has a medical issue that requires his release. *Id.* at 1. Specifically, he provided documentation that he has cholesteatoma, an abnormal growth of skin filled with air or fluid in the middle ear and temporal bone behind the ear drum. The government is sympathetic to Defendant's medical condition, but it does not mitigate the risk that he will flee, nor does it justify his release. And Defendant has not provided any evidence that the Bureau of Prisons is unable to provide appropriate medical care to Defendant while he awaits trial. *See Risner v. Fowler*, 458 F. Supp. 3d 495, 505 (N.D. Tex. 2020) (denying release to defendant pending extradition where, *inter alia*, defendant

---

[10] Notably, Defendant did not provide an amount of money he could deposit as bond during the detention proceedings. His brief advised that Defendant is "attempting to determine how much [he] is able to deposit," if he is unable to have the €750,000 Portuguese bond returned. DE 213 at n.12.

13

failed "to establish that he is suffering from a serious medical condition that the BOP is unable to properly treat"); *United States v. Wright*, No. 3:18-cr-635-N, 2020 WL 1694298, at *4 (N.D. Tex. Apr. 7, 2020) (noting that courts typically grant release to pretrial detained defendants for medical reasons "sparingly . . . where, for example, [the defendant] is suffering from a terminal illness or serious injury.") (quoting *United States v. Hamilton*, No. 9-CR-54-01, 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020)) (internal quotation marks omitted).

## **CONCLUSION**

Based on the foregoing, the United States moves that the Court impose an order of detention pending trial.

Respectfully submitted,

| | |
|---|---|
| JOSEPH S. BEEMSTERBOER | JENNIFER LOWERY |
| ACTING CHIEF | ACTING U. S. ATTORNEY |
| Fraud Section | Southern District of Texas |
| Criminal Division | |
| United States Department of Justice | |

| | |
|---|---|
|    */s/ Sonali D. Patel*    |  */s/ Robert S. Johnson*     |
| DREW BRADYLYONS | JOHN PEARSON |
| TRIAL ATTORNEY | ROBERT S. JOHNSON |
| SONALI PATEL | KRISTINE E. ROLLINSON |
| ASSISTANT CHIEF | ASSISTANT UNITED STATES ATTORNEYS |
| | |
| Fraud Section, Criminal Division | U.S. Attorney's Office |
| U.S. Department of Justice | Southern District of Texas |
| 1400 New York Avenue, N.W. | 1000 Louisiana, Ste. 2300 |
| Washington, D.C. 20530 | Houston, TX 77002 |
| Tel:(202) 514-1106 | Tel: (713) 567-9385 |

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 12, 2021, I filed the foregoing motion with the Clerk of the Court using the ECF/CM system for filing and service on all counsel of record.

*/s/ Sonali D. Patel*
Sonali D. Patel
Assistant Chief
Fraud Section, Criminal Division
U.S. Department of Justice